J. BRADY DUGAN
E. KATE PATCHEN (NY Reg. 4104634)
Antitrust Division
U.S. Department of Justice
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 436-6660

Attorneys for the United States

**FILED**

MAY X 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO VENUE

*EDL*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>MISAO HIOKI | CRIMINAL NO.<br>3 07 70260<br><br>NOTICE OF PROCEEDINGS ON OUT-OF-DISTRICT CRIMINAL CHARGES PURSUANT TO RULE 5(C)(2) AND (3) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE |

Please take notice pursuant to Rule 5(c)(2) and (3) of the Federal Rules of Criminal Procedure that on May 2, 2007, the above-named defendant was arrested based upon an arrest warrant (copy attached) issued upon a Criminal Complaint pending in the Southern District of Florida, Case Number 07-6177.

In that case, the defendant is charged with conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating market shares for sales of marine hose sold in the United States in violation of Title 15 United States Code, Section 1.

Date:　May 2, 2007

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　J. BRADY DUGAN
　　　　　　　　　　　　　　　　E. KATE PATCHEN
　　　　　　　　　　　　　　　　Antitrust Division
　　　　　　　　　　　　　　　　U.S. Department of Justice

　　　　　　　　　　　　　　　　By: _E K Patchen_
　　　　　　　　　　　　　　　　　　　E. Kate Patchen
　　　　　　　　　　　　　　　　　　　Trial Attorney

AO 442 (Rev. 12/85) Warrant for Arrest DOJ Trial Attorney Mark Pletcher, U.S. Dept. of Defense S/A Thomas H. Errion (954) 202-9167

Case 3:07-mj-70260-MAG Document 1 Filed 05/03/2007 Page 2 of 22

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

vs.

MISAO HIOKI

## WARRANT FOR ARREST

CASE NUMBER: 07-6177-SPOW

TO: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest _____ MISAO HIOKI _____

Name

and bring him forthwith to the nearest magistrate to answer a

□ Indictment □ Information ☒ Complaint □ Order of court □ Violation Notice □ Probation Violation Petition

charging him with engaging in a conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating market shares for sales of marine hose sold in the United States in unreasonable restraint of foreign and interstate trade and commerce

in violation of Title 15 United States Code, Section(s) 1 _____

LURANA S. SNOW
Name of Issuing Officer

*(signature)*
Signature of Issuing Officer

Bail fixed at $ 500,000 10% deposit

UNITED STATES MAGISTRATE JUDGE
Title of Issuing Officer

May 2007 Fort Lauderdale, Florida
Date and Location

*(signature)*
LURANA S. SNOW
by UNITED STATES MAGISTRATE JUDGE
Name of Judicial Officer

---

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above defendant at _____ | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

vs.

**CRIMINAL COMPLAINT**

CHRISTIAN CALECA,
MISAO HIOKI,
FRANCESCO SCAGLIA, and
VANNI SCODEGGIO.

CASE NUMBER: 07-6177-Snow

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning in at least 1999 through the present, in Broward and Monroe Counties, in the Southern District of Florida and elsewhere in the United States, co-conspirators of the defendants entered into and engaged in a conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating market shares for sales of marine hose sold in the United States in unreasonable restraint of foreign and interstate trade and commerce. Defendant Caleca joined the conspiracy at least by June 2001; defendant Hioki joined at least by October 2006; and defendants Scaglia and Scodeggio joined at least by January 2007.

All in violation of Title 15 United States Code, Section 1 _____

I further state that I am a Special Agent, DCIS, U.S. Dept. of Defense and that this complaint is based on the following

facts:

Please see attached affidavit.

Continued on the attached and made a part hereof: [x] Yes [ ] No

_Thomas H. Errion, II_
Signature of Complainant
THOMAS H. ERRION, II, Special Agent
Defense Criminal Investigative Service
United States Department of Defense

Sworn to before me, and subscribed in my presence,

May 1 , 2007                    at   Fort Lauderdale, Florida
Date                                 City and State

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE                _Lurana S. Snow_
Name and Title of Judicial Officer            Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Thomas H. Errion, II, being duly sworn, depose and state as follows:

1.   I am a Special Agent with the Defense Criminal Investigative Service ("DCIS"), Office of Inspector General, United States Department of Defense ("DoD"), Fort Lauderdale, Florida. I have been a Special Agent with DCIS since 1988. DCIS is the investigative arm of the DoD. As a DCIS Special Agent, my duties and responsibilities include investigating white collar crime, including procurement fraud, public corruption, money laundering and antitrust conspiracies. I have completed numerous specialized training courses, including the following courses at the Federal Law Enforcement Training Center in Glynco, Georgia: the Criminal Investigator Training Program; the DCIS Basic Course and Basic Criminal Investigator Training Program; the Advanced Fraud Course; Money Laundering and Banking; and the Reid Interview and Interrogation.

2.   I am a case agent in an investigation by a grand jury in the Southern District of Florida, conducted by DCIS, the Naval Criminal Investigative Service ("NCIS"), the Federal Bureau of Investigation ("FBI") and the United States Department of Justice, Antitrust Division, of price fixing, bid rigging, market allocation and related offenses by companies and other entities involved in the manufacture and/or sale of marine hose.

1

3.    I submit this affidavit in support of a complaint and
arrest warrant for CHRISTIAN CALECA, a French national; MISAO
HIOKI, believed to be a Japanese national; VANNI SCODEGGIO,
believed to be an Italian national; and FRANCESCO SCAGLIA,
believed to be an Italian national.  The proposed complaint
charges the defendants with engaging in a conspiracy to suppress
and eliminate competition by rigging bids, fixing prices and
allocating market shares for marine hose sold in the United
States in unreasonable restraint of foreign and interstate trade
and commerce in violation of Section 1 of the Sherman Act (15
U.S.C. § 1).

4.    The information contained in this affidavit is based on
my personal knowledge and observations accumulated during the
course of this investigation, on information I obtained during
interviews, on information conveyed to me by other law
enforcement personnel, on my review of documents and interview
reports, and on physical evidence.  I submit the affidavit for
the limited purpose of establishing probable cause in support of
this application for a complaint and an arrest warrant, and thus,
it does not contain every fact known by me or the United States.
Additionally, unless otherwise noted, wherever in this affidavit
I assert that an individual made a statement, that statement is
described in substance, and in part, and is not intended to be a
verbatim recitation of the entire statement.

2

I. **Evidence Establishing Probable Cause of a Violation of 15 U.S.C. § 1**

   A. **Overview**

   5. · The United States Department of Justice, DCIS, NCIS and the FBI are investigating a bid-rigging, price-fixing and allocation conspiracy from 1999 through the present involving six manufacturers of marine hose and a consultant who acts as the coordinator of the cartel. All of the defendants are executives with marine hose manufacturers that are involved in the conspiracy. There is probable cause to believe that defendants CALECA, HIOKI, SCODEGGIO and SCAGLIA joined the conspiracy between 2001 and 2007 as described below.

   6. Marine hose is a flexible rubber hose used to transfer oil between tankers and storage facilities and/or buoys. Marine hose is between six inches and twenty-four inches in diameter and comes in two basic types: floating, which sits above the water, and submarine, which extends beneath the water's surface. Companies involved in the off-shore extraction and/or transportation of petroleum products, including major oil companies such as Shell, Exxon and Chevron, purchase marine hose. DoD also purchases marine hose, including for use at military bases.

   7. Executives of manufacturers and/or sellers of marine hose, along with the consultant coordinator, have conspired to rig bids, fix prices and allocate market shares for sales of

3

marine hose in Broward and Monroe Counties within the Southern
District of Florida and elsewhere in the United States.
Defendant CALECA joined the conspiracy at least by June 2001;
defendant HIOKI joined the conspiracy at least by October 2006;
defendants SCAGLIA and SCODEGGIO joined the conspiracy at least
by January 2007. Such an agreement among competitors restricting
price competition for goods or services sold violates the law.
Bid rigging is a way for conspirators to raise prices effectively
where purchasers acquire goods or services by soliciting
competing bids. Essentially, conspirators agree in advance who
will submit the winning bid on a contract being let through the
competitive bidding process. Conspirators, as they have here,
may submit bids but take turns being the low bidder.
Conspirators may also agree to submit bids that either are too
high to be accepted or contain special terms that will not be
acceptable to the buyer. Such bids are not intended to secure
the buyer's acceptance, but are merely designed to give the
appearance of genuine competitive bidding. Conspirators, as they
have here, may also agree not to compete against other
competitors for customers in certain geographic areas. All such
agreements are criminal violations of the Sherman Act.

        8.    From at least 1999 through the present, marine hose
manufactured and/or sold by one or more of the conspirator firms,
and related ancillary equipment and special order products, as

well as payments for marine hose, traveled in interstate and foreign commerce. During this period, the business activities of defendants CALECA, HIOKI, SCAGLIA and SCODEGGIO and their co-conspirators in connection with the manufacture and/or sale of marine hose that are the subject of this complaint were within the flow of, and substantially affected, interstate and foreign trade and commerce. During the conspiracy, the defendants and their co-conspirators sold hundreds of millions of dollars worth of marine hose and related products.

   B.    Evidence of Conspiracy

       1.    The Cooperating Co-Conspirator

   9.    A foreign-based manufacturer of marine hose has admitted to the United States its involvement in the bid-rigging, price-fixing and allocation conspiracy from at least 1999 through at least 2006. This company ("cooperating company") has agreed to cooperate with the investigation and is negotiating a cooperation agreement with the Antitrust Division. If the cooperating company receives a cooperation agreement and abides by the terms of its cooperation agreement, the Antitrust Division will not prosecute it or its cooperating employees for any involvement they may have had in the marine hose cartel. However, the cooperation agreement will not absolve the cooperating company of restitution obligations it may have to its victims.

5

10. The cooperating company has produced numerous documents
to the Antitrust Division detailing the conspiracy. According to
its records, from at least 1999 through at least 2006, the cartel
rigged bids, fixed prices and allocated market shares for marine
hose sales around the world, including jobs in the United States
and at U.S. military bases in Turkey and Japan. I have reviewed
numerous emails and facsimiles from the coordinator to the
cooperating company through at least 2006, in which the
coordinator provided bidding instructions to the cooperating
company regarding upcoming jobs. Moreover, these documents make
clear that the marine hose manufacturers for which the defendants
worked, as described below, were members of the conspiracy
through at least 2006.

11. I also have reviewed evidence that confirms the
coordinator's ongoing efforts to rig bids, fix prices and
maintain the conspirators' allocated market shares for marine
hose sales around the world, including sales sought by U.S.
companies through the present. This evidence includes January
2007 telephone calls from and about co-conspirators, and emails
from February through April 2007 obtained with the assistance of
the cooperating company, confirming the coordinator's continued
efforts to manage the conspiracy through instructions on rigging
bids, fixing prices and allocating customers. As described
below, evidence obtained during the May 1, 2007 cartel meeting,

6

attended by defendants CALECA and SCAGLIA, the coordinator,
executives from the cooperating company, and other co-
conspirators, confirms that the conspiracy is ongoing through the
present.

12.    The DCIS has interviewed executives with the
cooperating company, including two confidential sources who were
members of the conspiracy (hereinafter "CS1" and "CS2").  For
many years, CS1 was the cooperating company's primary point of
contact with the cartel.  During interviews, CS1, CS2 and other
employees confirmed the cooperating company's involvement in the
cartel from at least 1999 through 2006.  CS1 and CS2 sold marine
hose for the company overseas, including in the United States.
They had responsibility for marine hose pricing and reviewed and
submitted prices in bids to customers.  I have corroborated much
of the information they have provided with documents obtained
during the investigation.  In my opinion, they are credible
witnesses.

13.    CS1 and CS2 described a conspiracy involving the
cooperating company, a consultant and five other manufacturers of
marine hose, including the following manufacturers for whom the
defendants work:  Trelleborg Industrie S.A. (hereinafter
"Trelleborg"), a French subsidiary of the Swedish corporation
Trelleborg AB, which manufactures marine hose in France and sells
it throughout the world; Bridgestone Corporation, which

7

manufactures marine hose in Japan and sells it throughout the world; Manuli Rubber Industries SpA (hereinafter "Manuli"), an Italian manufacturer of marine hose with operations in Broward County within the Southern District of Florida; and Parker ITR slr (hereinafter "ITR"), a marine hose manufacturer based in Italy, which is a subsidiary of Parker Hannifin Corporation, an Ohio company. One or more employees of Manuli who are participating in the conspiracy also reside in the Southern District of Florida, including in Broward County. According to CS1 and CS2, the conspirators reached illegal agreements to rig bids, fix prices and allocate market shares on virtually all sales of marine hose from at least 1999 through at least 2006, including those in the United States.

### 2. The Cartel's Consultant Coordinator

14. According to CS1 and CS2, to implement their illegal scheme, the conspirators paid a consultant to coordinate the conspiracy. This coordinator is a former executive of a marine hose manufacturer who now owns a consulting company. According to CS2, the coordinator has been a member of the cartel since at least 1999. CS1 and CS2 explained that it was part of the illegal agreement reached by the conspirators that each of the conspiring manufacturers provide the coordinator with the information they received about upcoming marine hose jobs. The coordinator then designated, based on rules agreed to by the

8

conspirators, which of the conspiring manufacturers would win the job.   In emails I have reviewed, the coordinator referred to the winning conspirator as the "champion."   The coordinator attempted to maintain market shares agreed to by the conspirators when designating which manufacturer would be the champion.   The conspirators adjusted these market shares as needed.   After designating the champion, the coordinator calculated how much other cartel members should bid to ensure that the designated champion would win the job.

15.   According to CS1, the coordinator sent the conspirators regular reports discussing allocations of previous jobs, pending jobs and the status of current jobs.   The cooperating company has produced a large number of documents corroborating the coordinator's role in the conspiracy.   I have reviewed documents evidencing communications by email and facsimile between the coordinator and other members of the cartel in which the coordinator provided bidding instructions on marine hose jobs as well as regular reports of the job allocations.

16.   Although the coordinator's consulting company does not sell or manufacture marine hose, and the cooperating company conducts no legitimate business with the coordinator, from at least 2001 to at least 2004, the cooperating company and other cartel members paid the coordinator approximately $50,000 a year to coordinate the cartel, for a total of approximately $300,000 a

9

year.  I have reviewed documents produced by the cooperating
company that show the coordinator sent invoices to the
cooperating company totaling approximately $140,000 between
October 2001 and April 2004.

### 3.    Defendant CHRISTIAN CALECA

17.   According to CS2, and corroborated by documents I have
reviewed from the cooperating company, Trelleborg has been a
corporate member of the conspiracy since at least 1999.
Defendant CALECA is the President of the Industrial Hose Business
Unit of Trelleborg in France which is the unit that manufactures
and sells marine hose.  There is probable cause to believe that
CALECA joined the marine hose conspiracy at least by June 2001.

18.   A June 1, 2001 email from the coordinator, obtained
with the assistance of the cooperating company, identifies
defendant CALECA as an anticipated speaker at a dinner being held
for the co-conspirators during a meeting held in June 2001 in Key
Largo, Florida, within Monroe County, within the Southern
District of Florida.  The email states that CALECA is a senior
manager who wanted to meet all of the members of the conspiracy.
According to CS1, in June 2001, CALECA gave the speech to the co-
conspirators as planned.  During his speech, CALECA thanked the
co-conspirators for coming to the meeting.  CALECA noted during
his speech to the cartel members that the cartel had caused
marine hose pricing to increase since the tough business years of

10

1998 and 1999. According to CS1, CALECA spoke on behalf of
Trelleborg.

19. Documents I have reviewed confirm that defendant CALECA
flew into the Southern District of Florida, on June 11, 2001. He
stayed at the hotel in Key Largo identified by CS1 and in the
coordinator's email as the location of the 2001 meeting.

20. During a May 1, 2007 telephone call with CS1, which was
recorded under the supervision of DCIS, the coordinator
identified defendant CALECA as one of the cartel members who
would attend an in-person meeting of the conspirators on May 1,
2007. The coordinator said that defendant CALECA would attend
the cartel meeting along with another Trelleborg executive who,
according to CS1, had attended the Florida meeting and was a co-
conspirator. According to CS1, this executive reports to CALECA
at Trelleborg. Further investigation by DCIS, as described
below, confirmed that CALECA attended this meeting of the
conspirators.

### 4. Defendant MISAO HIOKI

21. According to CS2, and corroborated by documents I have
reviewed from the cooperating company, Bridgestone has been a
corporate member of the conspiracy since at least 1999.
Defendant HIOKI is an executive involved in the sale of marine
hose for Bridgestone in Japan. According to CS1 and a third
executive of the cooperating company, in or about October 2006,

11

defendant HIOKI approached the cooperating company's executive to discuss the marine hose conspiracy and encouraged the cooperating company's participation.  From this conversation, there is probable cause to believe that defendant HIOKI was a member of the conspiracy at the time he approached the cooperating company's executive.

22.  During the May 1, 2007 meeting, described below, the coordinator described a private meeting he had earlier that day with defendant HIOKI.  During the meeting between defendant HIOKI and the coordinator, HIOKI confirmed that Bridgestone was fully supportive of the marine hose conspiracy.  HIOKI stated that he wanted to do whatever was necessary to stop the collapse of the market prices for marine hose.

5.    Defendant **FRANCESCO SCAGLIA**

23.  According to CS2, and corroborated by documents I have reviewed from the cooperating company, Manuli has been a corporate member of the conspiracy since at least 1999. Defendant SCAGLIA is a product manager at Manuli in Italy. SCAGLIA attended the May 1, 2007 meeting among the cartel members described below.

12

### 6.  Defendant VANNI SCODEGGIO

24.  According to CS1 and CS2, and corroborated by documents
I have reviewed from the cooperating company, ITR has been a
corporate member of the conspiracy since at least 1999.
Defendant SCODEGGIO is a business unit manager with ITR in Italy
who is involved in the sale of marine hose.  There is probable
cause to believe that SCODEGGIO joined the marine hose conspiracy
at least by January 2007.

25.  According to CS2, in January 2007, the coordinator told
CS2 in a telephone conversation, which was recorded under the
supervision of DCIS, that ITR wanted to discuss bids on an
upcoming marine hose job for which it was competing with the
cooperating company.  Defendant SCODEGGIO also left messages for
the cooperating company by telephone in January 2007.  Later that
month, SCODEGGIO spoke with CS1 by telephone and discussed the
upcoming marine hose job, suggesting that ITR and the cooperating
company each subcontract part of the job to each other.  During
the call, which was recorded under the supervision of DCIS,
SCODEGGIO used the ploy of claiming not to be in the conspiracy
to make it easier for the cooperating company to agree to the
scheme.  I believe however, based on further emails from the
coordinator described below, that SCODEGGIO was already a member
of the conspiracy at the time of the telephone call.

13

26.  An April 2007 email from the coordinator, obtained with
the assistance of the cooperating company, indicates that
defendant SCODEGGIO is now ITR's main representative in the
cartel.  This email confirms that the coordinator speaks to
SCODEGGIO regularly to keep him informed about the conspiracy.
The coordinator has also met in person with SCODEGGIO a few
times.  Since the coordinator has no known legitimate business
with ITR or SCODEGGIO, there is probable cause to believe that
all of these conversations relate to the ongoing marine hose
conspiracy, including the conversation in January 2007 about the
upcoming marine hose job.

27.  The April 2007 email, described above, also explains
that defendant SCODEGGIO replaced a former ITR executive as ITR's
main representative in the cartel.  The former ITR executive used
to be in charge of ITR's marine hose pricing.  According to CS1
and CS2, and confirmed by documents I have reviewed from the
cooperating company, the former ITR executive acted as ITR's main
representative in the cartel prior to SCODEGGIO joining the
conspiracy.  There is probable cause to believe, based on the
coordinator's emails, that SCODEGGIO took over the former ITR
executive's responsibilities for marine hose pricing at ITR
sometime at least by January 2007.

28.  Another email from April 2007, also obtained with the
assistance of the cooperating company, identifies defendant

14

SCODEGGIO as one of attendees of an in-person meeting of the conspirators on May 1, 2007.  The email shows that defendant SCODEGGIO would attend the cartel meeting as ITR's representative.  Another email from mid-April 2007, obtained with the assistance of the cooperating company, outlined the coordinator's proposed agenda for the May 2007 cartel meeting. The email shows that the conspirators planned to use this meeting to provide each other with the information they received about upcoming marine hose jobs, decide upon pricing strategies for marine hose, and discuss proposals for future cooperation, including new agreements and understandings.  It states the conspirators also plan to review market conditions, discuss changes within the marine hose industry, and talk about security measures.

29.  The May 1, 2007 meeting was planned to coincide with the conspirators' attendance at the Offshore Technology Conference ("OTC") in Houston, Texas, being held from April 30 to May 3, 2007.  The OTC is an annual worldwide conference of engineers, scientists and managers associated with the ocean resources industry.  According to travel information I have reviewed, one or more of the conspirators, including defendant CALECA, the former ITR executive, and representatives from the corporate conspirator based in Broward County, have attended the OTC from at least 2001 onward.  During past conferences,

15

according to emails I have reviewed from the cooperating company,
the cartel coordinator planned to discuss with the conspirators,
among other things, upcoming prices to quote for marine hose.

### C. May 1, 2007 Cartel Meeting

30.   The conspirators met in person as planned on May 1,
2007, in Houston, Texas.  Covert monitoring by DCIS and FBI
agents confirmed that defendants SCAGLIA and CALECA, the other
Trelleborg executive who reports to CALECA, the coordinator,
executives from the cooperating company, and representatives of
another marine hose manufacturers attended the meeting.  Court-
authorized audio and video surveillance revealed that the
coordinator led the meeting and introduced topics of discussion,
including how to keep market prices for marine hose high.  The
coordinator highlighted how much higher marine hose prices have
been since the conspiracy began compared to the lower prices
immediately before the conspiracy.  During the meeting,
defendants CALECA and SCAGLIA, the coordinator and the co-
conspirators discussed improving communications among the
conspirators and better, more secure ways to do that.  The
conspirators also discussed rules for implementing their bid-
rigging, price-fixing and allocation scheme, including not
bidding against a conspirator who is designated by the
coordinator to win a job.

### D.    1999 - 2002 Cartel Meetings

16

31.   Evidence I have reviewed confirms that the May 1, 2007
meeting in Houston was not the first time the conspirators have
held in-person meetings to set prices and discuss the cartel's
operation.   This evidence, which includes agendas and detailed
"minutes" of several of the meetings prepared contemporaneously
with the meetings, indicates that from 1999 to 2002, the
conspirators held at least four cartel meetings, at which
representatives from the conspiring corporations, including
defendant CALECA and the coordinator, were present.   In June
2001, as described above, the conspirators met in Key Largo,
Florida, within ~~Broward~~ Monroe County, within the Southern District of
Florida.   The conspirator based in Broward County hosted the
meeting.   At these meetings, the conspirators discussed and
agreed to the rules for implementing their bid-rigging, price-
fixing and allocation scheme.

32.   Evidence I have reviewed also reveals that the
conspirators took steps to conceal their communications with each
other and their involvement in the conspiracy.   For example,
according to CS1 and CS2, and confirmed in numerous documents I
have reviewed from the cooperating company, the conspirators
devised code designations to refer to each other in written
communications.   For example, ITR was designated "B3" and the
conspirator based in Broward County was designated "C."   I have
reviewed emails that confirm that the coordinator continues to

17

use these designations, including "B3" and "C," to communicate
about the conspirators as recently as March 2007.  In addition,
during their communications, confirmed by documents I have
reviewed, the conspirators attempted to conceal their actions by
referring to the cartel as the "club" or the "Technical Committee
- Marine Hose."

33.  Based upon the foregoing facts, I believe probable
cause exists to assert that beginning in at least 1999 through
the present, in Broward and Monroe Counties, in the Southern
District of Florida and elsewhere in the United States,
co-conspirators of the defendants entered into and engaged in a
conspiracy to suppress and eliminate competition by rigging bids,
fixing prices and allocating market shares for sales of marine
hose sold in the United States in unreasonable restraint of
foreign and interstate trade and commerce in violation of the

18

Sherman Act, 15 U.S.C. § 1.  Defendant CALECA joined the

conspiracy at least by June 2001; defendant HIOKI joined at least

by October 2006; and defendants SCAGLIA and SCODEGGIO joined at

least by January 2007.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

*Thomas H. Errion, II*

Thomas H. Errion, II, Special Agent
DCIS, Department of Defense

Sworn to and subscribed before me
this __1__ day of May, 2007.

*Lurana S. Snow*

The Honorable Lurana S. Snow
United States Magistrate Judge

19